Elwell *v.* Elwell, Appellant.

Argued April 27, 1931.

Before TREX-
LER, P. J., KELLER, LINN, GAWTHROP, CUNNINGHAM,
BALDRIGE and DREW, JJ.

*Max U. Applebaum,* and with him *Benjamin L. Steinberg,* for appellant.

*James F. McNaul,* for appellee.

OPINION BY GAWTHROP, J., July 8, 1931:

Defendant appeals from a decree of divorce granted to her husband on a libel alleging desertion on February 10, 1928. Her answer to the libel denied the desertion and averred that the libellant drove her from their home by cruel and barbarous treatment and indignities to her person which rendered her condition intolerable and life burdensome. The parties were married March 1, 1916. About eight months after the marriage libellant purchased a home at Crafton, Allegheny County, where the parties lived together continuously until March, 1927. Libellant provided well for his wife. In 1922 he established a joint bank

account, on which she was privileged to draw checks. Their married life was a happy one until May, 1926. At that time Stanton Elwell, a cousin of libellant, went to live with the parties upon libellant's invitation. In the fall of 1926 libellant noticed that his wife "was thinking too much of this other fellow," and that she had grown indifferent to him. Numerous arguments occurred between the parties about the intimacy between respondent and the cousin. In January, 1927, libellant requested the cousin to leave the home. He left that day and about a week later went to Carnegie to board with respondent's mother. Whereupon, respondent began making frequent visits to her mother's home, often remaining over night. In March, 1927, respondent left the common domicil and went to her mother's home where she remained until June 10th. Libellant testified that shortly before respondent left him on this occasion she told him that she was in love with the cousin and wanted to go with · him. He went to the home of respondent's mother and invited her to return to him. He testified that two or three days after she returned she started to cry and said that she was sorry that she had returned, and in about two weeks requested that the cousin be permitted to return; that she continued to make over-night visits at her mother's home, where the cousin continued to live, until February 10, 1928. On that day when respondent was at work she called him on the telephone and told him that she was going to her mother's. When he asked the reason, she said that she would return on one condition, "that you put the house in both our names." Respondent asked her whether she would "quit going out to her mother's as long as that fellow is there, if I put the house in both our names." She said, "No, I will continue to do the same as I have." He said, "then you might as well go." When libellant returned home in the

evening respondent and most of the furniture were gone. She went to her mother's home again. Shortly thereafter her mother moved to Ohio and respondent has continued to conduct the boarding house which the mother formerly conducted, and Stanton Elwell continued to be one of the boarders. Libellant continued to live in his house. He testified that about two days after February 10, 1928, respondent called him on the telephone and said she wanted to return to him; that he asked her "do you still think anything of that skunk out there," and that she said, "I still love him as a brother;" and that he said, "then the best thing to do is to go out there and stay until you hate him like a snake." She never returned to his home. Libellant's testimony tending to establish that respondent had lost interest in him and was in love with the cousin is strongly corroborated by the testimony of his witnesses.

Respondent's evidence offered to prove conduct by libellant which justified her withdrawal from home so utterly failed to meet the burden cast upon her under such a defense (Thomas v. Thomas, 96 Pa. Superior Ct. 258) that discussion of the testimony in that connection would serve no useful purpose. She did not deny that she separated from her husband for a longer time than the statutory period of two years. Her defense rests almost entirely upon alleged offers to return within the statutory period. She testified that she talked with her husband several times after she finally separated from him "to see if he wouldn't relent and say, yes, I could come back," and that he said he would not live with her. Libellant testified that he told her that she could come back and that, if she would come back and prove to him that she was trying to do what was right, he would start living with her. It is an admitted fact that she never went

back, although libellant continued to maintain the same house.

The determination of the questions whether or not respondent offered in good faith to return to libellant, and whether or not he refused to accept the offer, depends upon the credibility of these witnesses. The judge who saw them and heard them testify believed libellant. Our examination of their testimony has convinced us that the trial judge came to the right conclusion on this question. Much of the respondent's testimony bears the earmarks of untruth. We are persuaded not only that she was guilty of a wilful and malicious desertion in the beginning, but also that this incipient desertion was not broken by libellant's refusal to accept a bona fide offer on the part of respondent within two years to return to him. Therefore, the case is easily distinguishable from McGowan v. McGowan, 98 Pa. Superior Ct. 194, in which we said that the position of the husband was one of obdurate resistence to resumption of the status prior to the time of separation. Our conclusion is that the evidence fully and clearly established that respondent wilfully and maliciously deserted libellant and persisted in the same for two years without cause.

The decree is affirmed.